1516. Sorry about all the noise. Good morning, Mr. Carpenter. You reserved five minutes of rebuttal time, correct? I did, Your Honor. May it please the Court, Kenneth Carpenter appearing on behalf of Mrs. Regina Perkle. On June 12th of 2013, this Court held that in the implementing of the clear and unmistakable error in a 1953 VA decision, reducing Mr. Perkle's 100% rating, that the VA was required, as a matter of law, to consider the effects of that Q finding on the legal and factual basis of two subsequent decisions in 1956 and 1966. Do I understand right from your brief that you think that what should have happened, and what should now happen, is that in order to give a full and accurate, neither too big nor too small, remedy for the 1953 clear error, that you're not entitled to 100% automatically from 53 to 88, but that the VA should inquire what position Mr. Perkle would have been in with respect to disability ratings during that time, which might change over time? I thought your brief acknowledged that. Not changed over time, but changed at the specific time of the 1956 and 1966 decisions to reduce. As this Court explained in its decision in this case... I'm sorry, so the VA could decide on a remand that had the RO come in 1956 to starting with 100% rating, that there would nevertheless, outside the framework of what was actually in front of the RO in 1956, starting with 100% would nevertheless have reduced it to, was it 70 then to 50? 70 to 50 and then 50 to 30. And that's an open remedial question under a make whole but not make better principle. That's correct, Your Honor. And it's part of this Court's precedential decision in this case in 2013 that said that this was part of the implementing action and that Mr. Perkle had the right to appeal the VA's implementation of that request for revision, which they terminated at 56. And even the government concedes that there was jurisdiction to implement, no question about that. They then say, but nevertheless, 56 and 66, 67 are behind it. Can I ask you one legal question? I probably should know the answer to this by now. Hypothetically, suppose the VA has a legitimate 70% rating and then pursuant to some medical exam says, the RO says, we're going to reduce it to 50. Does the reduction take place, take effect? Do the payments get lowered immediately, even while you're appealing to the board? Now, are you asking in the first instance or are you asking in the remedial instance? No, this is just hypothetical. In the ordinary course of a reduction of a total rating. No, not a total rating. First, I'm trying to get straight. My point will eventually be, the answer to this question seems to me to have something to do with the applicability of the regulation or the non-applicability. So I'm trying to get an answer to the question. Forget about the 100% situation, 70 to 50. Does 50 take effect? Do the payments get reduced immediately, even during the many years you're in front of the board? Yes, they do. But with a 60 day down the road. Which is what they did in 56 and 66, right? And is there a regulation? I've had a hell of a time finding out where that is. I believe the regulation is at 3.105. It's not a... Okay, there was some language there that seemed close, but I wasn't quite sure. In which they give notice of the proposed, then they make the decision. When they make the decision, that decision goes into effect 60 days after the date. Sorry. And I'm sorry, I've now completely lost track of where I was. You were saying that the implementation remedy needed to look back at what might have happened in 56 and 66. Yes, and that's the critical piece here. Because what this court found in the original decision in this case was that, and this was an issue of first impression for this court. What happens when there are subsequent decisions that are affected by a finding of clear and unmistakable error? Not a finding of clear and unmistakable error, if you will, in decisions two and three. But the decisions two and three were dependent upon the clear and unmistakable error made in decision one. And in this case, it means that the rate is elevated back to the 100% rating. It was not 70, and it was not 50 in 56 and 66. It was 100%. And that 100% rating has very special procedural protections that are afforded a veteran. Is it fair to say, as the government says, maybe I guess you'll disagree, that what you're proposing is basically an extra statutory collateral attack on a rating decision. There's two statutory ways to do, as I understand, clear and unmistakable error, and then new and material evidence. Those are provided for in the statute. That's correct. To reopen an otherwise final denied claim for benefits. And now here, through this avenue that you're proposing, which is an implementation of our earlier decision from a few years ago, would essentially be a third non-statutory collateral attack on those 56 and 66 decisions. And I understand that that's their position, and that that was the reasoning of the board and of the Veterans' Appeals. Right. But is that premise correct? That this is a non-statutory way to revisit a denial of a benefits claim? It is correct to say that it is non-statutory. It is also correct to say that it was judicially mandated. And the judicially mandated decision was based upon an interpretation of the statute and what the statute required in order to make the veteran whole as a result of the clear and unmistakable error found in 53. But then I'm not sure I would say, if I were you, that it's non-statutory. It is an implication of the statutory provision for CUE on the 1953 decision. On the 1953 decision. But I thought Judge Shin's question went to the 1956 and 1966 decisions. Right. That implementing the statute as to the 1953 CUE has consequences for what would happen later, and the 56 and 66 decisions, which didn't even answer the relevant question, namely, can we go below 100, aren't preclusive of what would have happened in a make-whole remedy on the 53 CUE. That's correct. And I believe that that was the mistake made by the board, and the mistake then repeated by the Veterans Court, because they saw this through the narrow lens of a right to attack for the 56 and 66 decisions for CUE, which is not what has happened. What has happened is, is that Mr. Perkle was successful in his attack of the 53 decision, which then had consequential impact on the 56 and 66 decisions. And this court made clear that Mr. Perkle was entitled to that remedy, and he never got that remedy. The remedy being to apply regulation 3.343? Actually, it's 3.170 for the 56 and 3.343 for the 66. All right. Can I just say 3.343 for purposes of appeal, so I don't have to say both? Thank you. OK, so. Not that you need it by permission. Right. Then it comes down to, in your view, that the VA has to determine whether there's some kind of material improvement of the veteran. Under both statutory provisions. To be able to lower the rating from the 100% rate. Is that right? Well, actually, I don't believe it's as simple as, I think you've gone to a later consideration. Under the regulation, under both versions of the regulation, what is required is a VA examination prior to that action. And in both cases, in 56 and in 66, there was no preceding VA examination as required. That nullified any legal ability to take a reduction. Oh, OK. What happened then, if you recall, because I don't, what happened in 56 and 66 that triggered the VA to lower the rating? They mistakenly adjudicated it as though it were not a reduction case, but a case of entitlement to the rating. And the entitlement to the rating has been found by the Veterans Court to be a completely different process than the process of reduction.  No, Your Honor. So that's why I'm confused. What was the trigger then for the VA to say, OK, you're not better. You used to be 70. You're now 50. What was the trigger? Why did they do that? At his VA medical treatment records. And based upon those medical treatment records, lined up whether the symptomatology, as reported in those records, scored, as it were, for a 50% rating or a 70% rating. And they said it scored for a 50% rating. That is not the proper analysis. The procedural protection under 3.170 and 3.343 requires a VA examination to make a finding of material improvement under the ordinary circumstances of life. And that simply did not happen. Just to get back to where maybe we started, I took it that you acknowledge that were we to send this back, the VA still has the option of asking the question, what would have happened to his ratings had he come into 1956 with 100% and considering such evidence as exists, including the VA treatment records, might still conclude it would have been reduced as it was? If you understood that from my response, then I misspoke or was unclear. The regulation itself requires the presence of a VA examination that makes such a finding. So if no such VA examination is in the record, and it is not, then that reduction would be unlawful as a matter of law. They simply could not go further. They couldn't look to, as they did in 56 and 66, to the VA treatment records alone. That's what is the protection that is provided by these two regulations. Before we run out of time, can we talk about Reisenstein? Factually speaking, that case looks very similar to this case. And so I'm wondering, why shouldn't the stories of the two veterans, Reisenstein and Purkle, rise and fall together? Well, the Reisenstein case was predicated upon a stage rating based upon a grant over a significant period of time. That is not the factual circumstance here. There was no long-term retrospective determination over a period of decades as to what the rating should be. And what the court held in Reisenstein was, is that using the stage rating theory, that they were able to look sequentially through that decades-long period and determine at one point he was 70, at one point he was 100, and at a later point he was 70. So what if the board here had said, OK, in 53 you were 100, in 56 you were 50, and in 66 you were 30? Then you would have ignored the mandate of deregulation. I know, but I'm trying to fit it in within the facts of Reisenstein. Would that make your case just like Reisenstein if the board, when it issued the Q decision on 53, had said, OK, you get 100 from 53 to 56, you get 70, or I mean, you get 50 from 56 to 66, and from 66 to 88 you get 30. Would that be then just like— That would be wholly improper. That would be unlawful and illegal. It is simply not possible under the regulatory framework— OK, why could the board do that for Reisenstein but not do it for Perkle? Because of this concept that was adopted by, accepted by this court, by the representations of the VA of their longstanding policy of stage ratings, to rate in the extended period at different sequential periods. That's not what happened here. What happened here was— No, I understand it's not what happened here. My question is a hypothetical. My hypothetical question is when the board decision issued the Q decision, it created basically a stage rating in a retrospective sense. With respect— 53 to 56, 56 to 66, 66 to 88. And you're telling me that's illegal, OK. Tell me why that would be illegal. Because once a veteran is assigned a 100% rating and has that rating in place for five years or more, there are special protections that were created sui sponte by the secretary. These are not statutory mandates. These are secretary's regulations that mandate that you do not touch that 100% rating until certain predicates are met. That is not a prospective rating. That is a continuation of the protected rating of 100%. Isn't it enough that Roger Field is not a Q case? Does not involve Q? I don't think it makes any difference, Your Honor. OK. I don't think it makes any difference at all. OK, thank you. Mr. Tudor. Thank you, ma'am. With court. Respectfully request that the court confirm the decision of the court of appeals for veterans claims because the board, and later the veterans court, properly complied with this court's remand order in considering whether 3.343 or its predecessor regulation affected. They concluded that it did not affect the later ratings based upon this court's reasoning in the Reisenstein decision, which it found to be analogous to the situation of applying a Q rating to later rating stages, and also the cousin. Since you start with the regulation, I guess here is the issue that I'm focused on. It seems to me that the language of this regulation is readily susceptible to the Reisenstein staged rating interpretation because the language of this regulation is about an agency adoption of a rating with open-ended prospective effect unless the agency comes back later and changes it. And that's not what you're allowed, and you're not supposed to make that change in 100% situation without complying with the regulation. The staged rating determination simply doesn't involve that. It's looking backwards and say, when were you disabled by how much, even on the initial claim? So the language of the regulation permitted the Reisenstein interpretation. I don't see how the language of this regulation permits this interpretation that there is supposed to be, that the regulation is in, I'm sorry, yeah, that the regulation is in applicable when there is an announced, indefinite, open-ended prospective rating that is later going to be a rating of 100% that is later going to have to change. Okay. So taking the court's question, I'm understanding it. So the prospective effect... The text allowed Reisenstein. It doesn't here. The policy consideration behind the VA's interpretation in Reisenstein and the language talked about... Policies don't reach beyond the text. This was an explanation for why that particular textually available interpretation made a kind of sense, not anything more. The particular standard here was you can't reduce the 100% to a lower level absent a showing of material improvement. There are two reasons why there's compliance here. One is whether this applies in the context of a retroactive application. VA concluded it does not. Second is whether there would be evidence in the record to support a shining material improvement. Let me pick up on this. Suppose you had a 100% rating and then along comes the VA and it reduces it to, say, 50%. Now, I assume you agree with Mr. Carpenter, that takes place immediately. The payments get cut in half 60 days after the RO decision. We don't have reason to disagree with that. Okay. And then you go to the board and it takes, I don't know, three years and you go to the veterans court and it takes another two years and you come here and finally you get a decision saying the board was wrong to make that reduction. Are you going to say that because there were no 100% payments reduced that the remedy is only from that point forward and the five or six years of 50% payments don't get remedied because after all, this regulation doesn't apply. He hasn't been getting the money. Well, in this context, the Q... Forget about Q. I didn't mention Q. All right. So the effective board, you know, so you give prospective effect or retroactive effect to the 100% rating. Then the question is whether... Why? According to you, this regulation applies only if they've actually been getting the plain old non-Q situation for five years in appeal. They haven't been getting the money. All I was talking about was whether they were getting the money. So did they get the money in a lump sum or a back retroactive? Yes, they got the 100%. Similar to the Q here, they got the 100% for the full period from 53 to 57. I think we're not communicating. You have this theory that if the person has not been getting the money, the regulation doesn't apply during the period when the person has not been getting the money. That seems to me to require you to say, outside the Q context, in a five-year appeal of a RO reduction, that turns out to be wrong. The remedy on that appeal doesn't provide for truing up that five years worth of half underpayments because the regulation doesn't apply. You haven't been getting the money. My understanding is that regulation is only applying if you're reducing 100% rating to something low. That was my hypothetical. If the board rules that this person has 100% rating as of this date, then at a certain point, if they want to reduce it at a later point, then there would be the material improvement standard. Beyond that, I don't have a precise explanation under regulation what would happen outside the Q context on that since we're here talking about the Q context. To the extent you understand what I'm getting at and to the extent I'm clear, I have a very hard time understanding how this taking of this retroactive you weren't getting the money principle out of the linguistic context and saying, as long as you weren't getting the money, we can ignore the regulation for the period that you weren't getting the money. I don't see how that makes any sense. Because it genuinely would require, as far as I can tell, that in a direct appeal of the reduction from 100 to 50, that relief when you finally get out of the veterans court or out of the board years later would not pay you for the missing years of the incorrect reduction. My understanding as I'm standing here is that if you've gotten a 100 percent rating at some point, at that point, if you're going to have a later examination to lower that to a lower level, that's the point when 3.343 would kick in. Now, the effect of how you get to that 100 percent rating, whether it's on an appeal from a lower rating and then the board makes it a higher rating, that's a different question. I'm not — I don't think I have all of the answers to what the Court's asking about that. What we're talking about here is if you're starting with a 100 percent rating when you have — and here the queue says, okay, there's a 100 percent rating from the 53 to 57 period. What is the effect of that when you're looking at later rating periods? Now, the vehicle that the veteran could have followed to give effect to that would be to make a queue challenge to the latter time period, to the 1956 period. There are separate questions here about the kind of statutory preclusive effect of what happened in 56 and 66 or 67 and the straightforward regulation applicability question. I do not see how this regulation does not apply in 56. Okay. So, I guess the answer to that would be if back — we had a time machine to go back to 1956 and the veteran — that's what make-whole remedies are. They are speculative, you know, but for hypothetical reconstructions of what would have happened. So, the best evidence we have of that is on page 76 of the record, which was the statement of the case from the regional office in February of 2008, where the regional office concluded that the regional office did comply with the predecessor regulation 3.170 in 1956 and that the record did support a finding of material improvement. But the board didn't address it. The board didn't address it because the veteran on appeal said, I'm not challenging the 1956 decision on the basis of queue. I'm making this procedural decision to only try to implement the 1953 decision. Why is he not entitled to a board decision about what would have happened in 56 if, coming into 56, he had 100%? And Mr. Carpenter wants to take that further than I'm — than it's clear to me he's entitled to. That is, my but-for question would allow a board determination that the best evidence of what would have happened in 56 is found in what did happen in 56, even though that was legally incorrect. Okay. So, the board and the veteran's court — You can't fix the regulation problem now. Okay. So, the board and the veteran's court concluded on the strength of Reisenstein and its interpretation of the jurisdiction, but getting on that to Reisenstein that the regulation didn't apply to its examination of 56. If it were to consider it and say, okay, Reisenstein doesn't apply here, we're going to look at what happened in 56. First, we have the evidence from page 76 of the record that the regional office concluded yes, it did it. And then looking at the definitions of the standards for disability, which are at page 71 of the record, that the examination from 56 met the definitions of what would be a 50% disability rate. Now, the board did not make those factual determinations on remand from this court's decision. Why isn't he entitled to that? Because we believe the board's interpretation that Reisenstein applies in this context is correct. Take as an assumption, which I know you're contesting, that the regulation does apply and that it had to govern any reduction that would have occurred in 56. Perhaps the regulation was not complied with, but if the remedy question now is what would have happened, then why isn't the question, what does the evidence tell us would have happened if that regulation were being followed? Well, under the court's hypothetical... You said the RO said something about that, but the board did not. All right. The board did not. The board also didn't express disagreement at any point with the RO's conclusion. But if the question is, did the board address the same question that the RO took up in 76, the answer is no, except that the board did take up that question of whether there was Q in the 67 board decision in August of 2002 and concluded that there was no Q. We believe that the proper procedural mechanism for the board to take up is not a remand on the going forward effect of the 53 decision without reference to later rating decisions, but whether there was actual Q in those later rating decisions, which, among other things, would require an examination of the very kind of medical evidence that the court's question asked whether the board was actively considering in this context. Therefore, there had already been, the RO had already turned down the Q for both rating periods, and the board, on an appeal, turned it down in 67. So under the court's Hilliard decision, then that decision can no longer have Q claim. This would be a way to get around, basically, the court's Hilliard decision, which would be one problem with that approach. But putting that aside, the proper mechanism would be to make a Q claim to the latter two time periods. That would be a way to consider the medical evidence and whether 3.170 or latter 3.343 were complied with. Why doesn't the Q rating in 53 affect the subsequent two ratings? There were separate examinations, and those are found at page 31 and 32, and then 33 and 34 of the record. So you have a separate examination for each time period. Veterans Council made reference to, there's a VA regulation on stabilized ratings. Once a rating's been in place for five years, then there's heightened standards to lower that. That wouldn't be applicable here because the rating from 53 to 57 was in effect for less than five years. And? And? 56 to 66, that's more than five. 56 to 66 was a rating of, an independent rating of 50 percent. So that was the, so it's a late rating, so that's a different application. And during the period from 66 onward, I mean, the man was not only employed, he was employed by the VA. So he was, I mean, he was employed. There was examination of, you know, his level of disability. You know, there's no claim that his examinations themselves were not compliant. It's simply a matter of whether, they didn't use the words material improvement because they had no reason, they had no occasion to think about that at that time because that was in front of them. I guess what I want to say is, what you just said sounds like it might be relevant to the remedial inquiry, but the board didn't conduct that. They did not conduct that factual inquiry because they concluded that, they are asking, they're answering the question the court asked, you know, do these regulations apply here? Their answer was no, they don't apply here because of rising fees. If that, if the court concludes that's wrong, then the proper remedy would be for the board to say, okay, make this explicit factual analysis, even though we think that they've already gotten the Q analysis that they, the veteran already got the Q analysis back in 2005 and for the 67 board decision in 2002, we don't think there's a way around that. But that would be a question to be encountered only after there's a separate Q claim. We think that's the proper vehicle. If the court thinks that the proper vehicle is to look at the 53 decision without requiring separate Q claims, then the board would be doing a factual analysis of whether the medical records here, pages 31 through 34 of the record, comply with these standards that were in effect at the time, 3.170 and 3.343, notwithstanding the Reisenstein decision. So are you saying that the court's decision on purple one was wrong? No, we're saying that it was complied with. It was simply, the court asked, hey, did these regulations apply? The board gave an answer. No, they don't apply. Did the VA ignore the purple one decision? No, they were, they were applying it. So they said, the court has asked us a question. Does, do these, do the, does the 3.343 regulation change the legal and factual basis? They said no. Did the court say, do this? And you said, well, we've thought about it and we don't have to do it. They said the court, the court's order was to consider the effects. So they considered the effects and concluded that there was none in light of Reisenstein. And the purple one decision did not address Reisenstein. If the court concludes that that analysis was incorrect, the proper remedy would be to remand for the board to look at that specific factual question. But we think there's evidence in the record to support the conclusion that there was no 3.343 was complied with in the 56 rating decision. What is the VA's understanding of what it means to be material improvement in 3.343? Is it even a 10% improvement? You know, say you're getting benefits at 20%, but then there's an assessment that the person has improved to a point where it's really only a 10% disability. Is that deemed a material improvement? We looked and we didn't find a definition of material improvement, but here the 56 rating decision was a 50% rating and complied with the standards for mental illness disability that were put forth at page 71 of the record, among other things. Whether the person has remained employed, there is a question of flatness of affect, how debilitating if there's depression, how much it would be. Here the 31, page 31 said, well, he's depressed, but he makes himself carry on and he has some flatness of affect. These complied with the standards put forth for a 50% rating. We don't have a definition of what material improvement would be, but a 50% level compared to 100% level would represent a material improvement and was the regional office's assessment at page 76 of the record. Okay, thank you. Mr. Carpenter, we took you over your time, so we'll give you back three minutes. Well, Your Honor, even though there's a lot I would like to offer, I do not believe that it will be of any particular benefit to the panel. If there are any further questions from the panel, I would You told me earlier that there was no medical examination, either 56 or 66. That's correct, and I stand by that. So what's going on at 831 to 34? I have no idea what the government's talking about. It's not in the joint appendix, Your Honor. 831 to 34? Is it 331 or 31? 31 to 34 is a rating decision, Your Honor, that says VA examination. There is no VA examination in the record. Now, I understand that that's what's printed on that sheet. That's a rating decision. Right, I'm just trying to understand. It says, date of last examination, 9-29-56, at 831, for example. I'm sorry, at 831. The little box in the upper right-hand corner. That's correct, Your Honor. Okay, so it indicates that there was an examination on September 29-56. Is that how I should read it? I'm just trying to understand. That there was an examination. It makes no, and it's not included in this record, any determination that upon that VA examination, that examiner found material improvement. No, I understand. I'm just trying to understand if there was a VA examination or not. And this seems to be indicia that there was one in 1956. And I'm sorry. As in our purple one opinion in 2013, where at 1380 we said, we summarized what happened in 56, saying there was a newly acquired VA medical examination 56, and there was a newly acquired VA medical examination 66. So I'm just trying to get to the bottom of this. And I apologize, Your Honor. I may have not been clear. There is not a VA examination of record that addressed the procedural criteria of the regulations that require. It's different than saying that there was never a VA examination. And I apologize, Your Honor. I misspoke. I was not correct in that statement. Unless there's further questions or clarifications. Thank you very much.